**Affirmed and Opinion Filed October 24, 2023**



In The

**Court of Appeals**

**Fifth District of Texas at Dallas**

_____

**No. 05-22-00476-CR**
_____

**APOLONIO RODRIGUEZ III, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 199th District Court**
**Collin County, Texas**
**Trial Court Cause No. 199-80716-2022**

# OPINION

Before Justices Partida-Kipness, Reichek, and Miskel
Opinion by Justice Miskel

Apolonio Rodriguez III appeals the trial court's judgment convicting him of

the first-degree felony offense of aggravated assault with a deadly weapon involving

family violence. The jury found him guilty as charged and assessed his punishment

at life imprisonment.

Rodriguez raises three issues on appeal. First, he argues that the State made

improper opening statements about people who commit domestic violence. Second,

he argues that the trial court erred in overruling his objection to the admission of

extraneous bad acts. Third, he argues that the trial court erred in excluding

Rodriguez's testimony that the complainant's brother was a possible alternative perpetrator. As to his first issue, even assuming the trial court erred, we conclude that any error was harmless. As to his other issues, we conclude that the trial court did not err. The trial court's judgment is affirmed.

## I. BACKGROUND

The complainant, "Catherine," met Rodriguez through a mutual contact who was her friend and his cousin, and their relationship progressed quickly.[1] They started talking around Thanksgiving 2018, met in person mid-December, and officially became a couple soon thereafter. Rodriguez was living in a friend's house, and Catherine moved in with Rodriguez and his friend in April 2019.

However, Rodriguez soon became preoccupied with the idea that Catherine was cheating on him, which she denied. One night in May, he accused her and hit her in the face. She started to leave, but he apologized, and she stayed. In August, they moved out of their friend's house and into another house in Celina, Texas. Catherine learned she was pregnant that September. The couple was ecstatic. Catherine had always wanted to be a mother. Rodriguez, however, continued to ask her whether she was cheating on him, to the point that it felt to Catherine that he did so every day.

Rodriguez's obsession persisted into the following year when, on Sunday, February 16, 2020, he again hit her in the face while accusing her of cheating. The

---

[1] In this opinion, we use a pseudonym for Catherine to protect her identity.

blow left her with a black eye. She called in sick to work for two days before returning to work on Friday, February 21, wearing heavy makeup to conceal the bruise. When asked, she told her manager that she had been hit in the eye with a football. Catherine explained at trial that she lied because she was ashamed and to protect Rodriguez.

The next night, Rodriguez and Catherine went over to his friend Jen's house around 9 p.m. to socialize. The atmosphere grew tense when Rodriguez again accused her of cheating, and they began arguing. Jen told them to go talk out their problems, so they went to Jen's car and continued the argument for the next two hours, with Catherine repeatedly denying she was unfaithful. Close to midnight, the argument subsided, and Catherine suggested that they go home. Rodriguez refused. Catherine went home alone and went to sleep on the couch.

At some point, she was wakened by a call from Rodriguez. He asked what she was doing, and she told him that she had been sleeping. Rodriguez, however, believed that someone else was there. He insisted on a video call, and Catherine took the phone around the house to show him no one else was there.

Around 2 a.m. on the morning of February 23, Rodriguez returned to the house and entered through the side door. He said that he had just seen a car pulling out of their driveway and demanded that she unlock her phone. Catherine pointed out that he already had the passcode to her phone. Rodriguez, however, believed that there

was a hidden messaging application on her phone and insisted that she reveal it to him. She pleaded with him. He hit her in the face.

He proceeded to strip off her pants and stick his fingers in her vagina, telling her that if she was going to act like a whore, she would be treated as one. He believed that she was aroused and demanded to know why. He took a knife and inserted the handle into her vagina. He then held the knife to her throat and later stabbed her thigh.

Rodriguez choked her and beat her with his fists and various objects while she lay naked on the floor. One object was a coffee mug, which he struck her with on the top of her head, leaving a large gash. She blacked out momentarily. Rodriguez also struck her repeatedly with a golf club, beating her everywhere on her body except her pregnant stomach, which she protected with her arms and a pillow. At one point, he picked up her pet turtle, Franklin, and threatened to kill the turtle if she did not tell him the truth about her affairs. She denied cheating and pleaded with him to listen to reason. Rodriguez brought the club down on Franklin's shell, cracking it in half, and tossed the turtle in the trash.

He hit her with the golf club until the head of the club broke off on her elbow, leaving her elbow broken. He then struck her with the handle of the golf club until it, too, snapped in half. He also beat her with an extension cord, whipping her all over her body with both the head and the plug as she lay in the fetal position. At

some point, he kicked her in the nose, breaking it. When she screamed, he would choke her. In all, the assault lasted three hours.

The next day, Catherine called in sick to work. Catherine's friends, who were concerned by her uncharacteristic pattern of calling in sick to work and wearing heavy makeup, called for a wellness check. An officer visited the home on Monday, but the couple did not answer the door and hid in the closet.

Catherine believed that the officer might return and wanted to both protect Rodriguez and reduce the potential for further violence, so she suggested that they go stay at his mother's house. When they arrived, Rodriguez told his mother that Catherine had been beaten up in the parking lot of a Walmart, and Catherine went along with the story. She was in and out of sleep for much of the next few days. At one point, she and Rodriguez had sex, though Catherine testified that she was too afraid to reject him. Catherine's friends and family tried to contact her, but she insisted she was fine via text message and was otherwise noncommunicative.

On the night of February 27, police arrived at Rodriguez's mother's house and set off a flashbang as they prepared to raid the house. Rodriguez rushed Catherine to the attic, where they hid in the corner by lying down and covering themselves with fiberglass insulation. Officers located them and arrested Rodriguez. Catherine was taken to the hospital, where she stayed for roughly a week. Catherine initially told police and hospital personnel that she had indeed been jumped in the parking

lot of a Walmart. However, she eventually confessed that Rodriguez had attacked her.

Rodriguez was indicted on a first-degree felony charge of aggravated assault of a family member causing serious bodily injury with multiple deadly weapons, including a golf club, a coffee mug, an extension cord, fists, and feet.

At trial, the jury heard from multiple witnesses, including Catherine; her concerned friend; her sister, who had visited her house after the assault and found a bloodstained pillow in the trash; the emergency room doctor, who had treated her injuries and testified that they were dire and potentially deadly; Rodriguez's friend Jen; an officer who had investigated the report concerning the Walmart parking lot and learned that the store was closed at the time of the assault; Rodriguez's mother; and Rodriguez himself. The jury also saw physical evidence including the golf club, which had been snapped in three pieces; the bloodstained pillow; and photographs of various blood-spattered items in the home, Catherine's pervasive bruising, and the turtle's cracked shell.

Rodriguez testified that he had not committed the assault and that Catherine left to get food after he returned home around 2:30 or 3 a.m. on the night of the assault. He testified that she returned with bruising on her face and arms and said she had been attacked in the Walmart parking lot. He testified that he wanted to call the police but that Catherine told him not to call them.

After considering the evidence, the jury found Rodriguez guilty and that he had used a deadly weapon. The jury assessed punishment at life in prison, and the trial court sentenced Rodriguez accordingly. He appeals.

## II.   ANY ERROR IN ALLOWING THE OPENING STATEMENT COMMENTS WAS NOT HARMFUL

In his first issue, Rodriguez contends that the trial court erred when it overruled his objection to the State's comments as stereotyping him during its opening statement. Rodriguez asserts that the State was permitted to make unfair generalizations when it asked, "Because what do we know about people who commit domestic violence?" and then stated, "As we mentioned during voir dire, we know that people who commit domestic violence try to maintain control over their victims." We conclude any error in overruling the objection to the statements is harmless.

### A. Standard of Review and Applicable Law

The character and extent of opening statement are subject to the trial court's control. *Norton v. State*, 564 S.W.2d 714, 718 (Tex. Crim. App. [Panel Op.] 1978); *Taylor v. State*, No. 05-19-00671-CR, 2021 WL 3732612, at *1 (Tex. App.—Dallas Aug. 24, 2021, no pet.) (mem. op., not designated for publication). An appellate court reviews rulings on opening statements for an abuse of discretion. *Taylor*, 2021 WL 3732612, at *1. A trial court abuses its discretion if its ruling falls outside the "zone of reasonable disagreement." *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g); *Taylor*, 2021 WL 3732612, at *1.

The opening statement in a criminal case should inform the jury of the nature of the accusation against the defendant and the facts that the State in good faith expects to prove. *Phifer v. State*, No. 05-18-01232-CR, 2020 WL 1149916, at *7 (Tex. App.—Dallas Mar. 10, 2020, pet. ref'd) (mem. op., not designated for publication); *see also* TEX. CODE CRIM. PROC. ANN. art. 36.01(a)(3). The purpose of the opening statement is to communicate to the jury the party's theory of the case to aid the jury in evaluating the evidence as it is being presented. *Taylor*, 2021 WL 3732612, at *1. Jury argument should not be made during opening statement. *Id.* at *4; *Ramires v. State*, No. 02-16-00185-CR, 2017 WL 4542857, at *5 (Tex. App.—Fort Worth Oct. 12, 2017, no pet.) (mem. op., not designated for publication).

Most comments that fall outside the area of permissible argument are considered nonconstitutional error. *See Broussard v. State*, No. 01-08-00574-CR, 2009 WL 566935, at *3 (Tex. App.—Houston [1st Dist.] Mar. 5, 2009, no pet.) (mem. op., not designated for publication) (applying nonconstitutional harm analysis under Rule 44.2(b) to argumentative remarks in the State's opening statement); *see also Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g) (concluding that comments falling outside the areas of permissible closing argument constituted nonconstitutional error under Rule 44.2(b)); *Martinez v. State*, 17 S.W.3d 677, 692–93 (Tex. Crim. App. 2000) (applying nonconstitutional harm analysis under Rule 44.2(b) to prosecutorial comments upon matters outside the record during the punishment phase in a capital case).

Courts must disregard any nonconstitutional error that does not affect substantial rights. TEX. R. APP. P. 44.2(b). A defendant's substantial rights are affected when the error has a substantial and injurious effect or influence in determining the jury's verdict. *Cook v. State*, 665 S.W.3d 595, 599 (Tex. Crim. App. 2023).

In reviewing whether improper comments by the prosecutor during opening statement constitute reversible error, appellate courts have considered whether, when viewed in conjunction with the record as a whole, the statement was so prejudicial as to deny appellant a fair trial. *See Coleman v. State*, No. 14-19-00868-CR, 2022 WL 553106, at *10 (Tex. App.—Houston [14th Dist.] Feb. 24, 2022, pet. ref'd) (mem. op., not designated for publication); *Strong v. State*, No. 11-18-00127-CR, 2020 WL 2836999, at *5 (Tex. App—Eastland May 29, 2020, no pet.) (mem. op., not designated for publication); *Herrera v. State*, 915 S.W.2d 94, 97 (Tex. App.—San Antonio 1996, no pet.); *Sweaney v. State*, 632 S.W.2d 932, 935 (Tex. App.—Fort Worth 1982, no pet.); *see also Martin v. State*, No. 05-16-01328-CR, 2017 WL 4675133, at *2 (Tex. App.—Dallas Oct. 18, 2017, no pet.) (mem. op., not designated for publication) (concluding that any error in the State's opening statement did not foreclose appellant's ability to receive a fair trial).

More specifically, to assess harm from improper prosecutorial remarks during an opening statement, some courts have also looked to the following three *Mosley* factors used by the Texas Court of Criminal Appeals in conducting Rule 44.2(b)

–9–

nonconstitutional harm analysis for improper closing arguments: (1) the severity of the State's misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks), (2) measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the trial court), and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Mosley*, 983 S.W.2d at 259; *see also Molina v. State*, Nos. 05-09-01532-CR, 05-09-01533-CR, 2011 WL 3528190, at *2 (Tex. App.—Dallas Aug. 12, 2011, pet. ref'd) (mem. op., not designated for publication) (examining *Mosley* factors to assess error in denying a motion for mistrial based on the prosecutor's improper jury argument in the opening statement of a punishment trial); *Perdomo v. State*, No. 12-22-00042-CR, 2023 WL 3371087, at *3 (Tex. App.—Tyler May 10, 2023, pet ref'd) (mem. op., not designated for publication) (examining *Mosley* factors in considering whether trial court erred in denying motion for mistrial based on prosecutor's opening statement remarks regarding appellant's failure to testify); *Coleman*, 2022 WL 553106, at *10; *Strong*, 2020 WL 2836999, at *5; *Broussard*, 2009 WL 566935, at *4.

Assuming without deciding that the State's complained-of opening remarks in the present case constitute improper jury argument, we will consider the *Mosley* factors to determine whether they had a substantial and injurious effect or influence on the verdict.

**B. Any Error in Allowing the Statement Was Harmless**

Rodriguez asserts the trial court erred when, during the State's opening argument, it overruled his objection to the State's discussion of how people who commit domestic violence behave. The State made these remarks during the following discussion of a phase of the assault when Rodriguez struck Catherine's pet turtle Franklin with a golf club:

> [The State]: This wasn't an assault that took 10 minutes. It didn't take 30 minutes. It didn't take an hour. Three hours long. Three hours. From 2:00 a.m. to 5:00 a.m. with the defendant yelling at her: Open your phone. Unlock your phone. Show me the messages. Because the defendant was obsessed with the fact that he believed that she had been cheating on him. And in order to try to control the situation, at one point, he grabs [Catherine's] pet turtle that she's had since she was a kid. And he takes that turtle, and he tells her: Tell me the truth. Tell me the truth right now or Franklin, the turtle, is going to get it.
>
> And [Catherine] is pleading with him. I'm not cheating on you. There are no messages. I don't know what you're talking about.
>
> And what does this defendant do? He takes that golf club, and he slams it down on Franklin, cracks Franklin's shell. And he goes: Well, I guess that's the end of Franklin. And tosses him to the trash.
>
> *Because what do we know about people who commit domestic violence? We know they will do whatever they can—*
>
> [Defense Counsel]: Judge, I object at this point. It's beyond opening statement to lay out the facts. It's going into argument.
>
> The Court: Overruled.
>
> [The State]: *As we mentioned during voir dire, we know that people who commit domestic violence try to maintain control over their victims.* They can do it physically through assaulting them. They can do it emotionally through their words. And they can also do it psychologically. And that's what Franklin was. He was a weapon that the defendant used against [Catherine].

(Emphasis added.) According to Rodriguez, these statements evoked stereotypes of controlling, abusive romantic partners and unfairly grouped him with domestic violence perpetrators. Rodriguez asserts that by stating "we know" what "people who commit domestic violence" do, the State aroused the jury's own preconceived notions of domestic abusers and went beyond the permissible scope of an opening statement, which is confined to what the State expected the evidence to show.

We will assume without deciding that the trial court erred when it overruled Rodriguez's objection to these comments. Even so, any error was harmless because, when viewed in conjunction with the record as a whole, the statement was not so prejudicial as to deny appellant a fair trial or have a substantial or injurious effect on the verdict.

First, the severity of the State's misconduct and the magnitude of its prejudicial impact were not great. The remarks were not particularly egregious or prejudicial given that Rodriguez was on trial for aggravated assault involving a family member, and the State expected to offer evidence demonstrating his domestic abuse and attempts to control Catherine. Because opening statements should be limited to facts expected to be proved, slightly argumentative comments are generally deemed improper primarily due to their occurrence in the opening statement rather than due to their content.

In addition, the remarks occurred during opening statement, which is "far removed" from the critical moment of the jury's decision. *Norton v. State*, 930

–12–

S.W.2d 101, 104 (Tex. App.—Amarillo 1996, pet. ref'd). "Statements occurring during final argument are uniquely compelling since they are the last thing that the jury hears before they retire[] to deliberate." *Amis v. State*, 910 S.W.2d 511, 515 (Tex. App.—Tyler 1995, pet. ref'd). "Consequently, an improper statement made early in the trial would have less of an impact on the jury than the same statement made during closing argument." *Id.* (citing *Jackson v. State*, 726 S.W.2d 217, 221 (Tex. App.—Dallas 1987, pet. ref'd) (op. on reh'g)). Thus, at least to some extent, the statements' position in the trial tends to reduce any prejudice that flows from them.

With respect to the second factor, the trial court overruled the objection and thus did not give any curative instruction to the jury, so this factor weighs in favor of Rodriguez. We note, however, that the State partially cured any prejudicial effect of these statements when it introduced evidence that Rodriguez committed domestic abuse based on a motive to jealously control Catherine, which tended to vindicate the statements in part. *See Banks v. State*, 643 S.W.2d 129, 133 (Tex. Crim. App. 1982) ("The opening remarks about evidence which was thereafter properly admitted did not constitute error."). The State did not offer expert testimony explaining that exertion of control through violence was typical of domestic abusers. However, the State at least partially fulfilled the good faith expectations that this portion of the opening statement created. *See Taylor*, 2021 WL 3732612, at *4.

Finally, the state and strength of the record weigh heavily against a finding of harm. The disputed aspects of the case concerned whether Catherine's wounds constituted serious bodily injury and the identity of the assailant. As to serious bodily injury, the jury heard evidence about her two broken bones—Catherine's nose and elbow. Her broken elbow required implantation of a plate and screws and two surgeries that left scarring and resulted in a permanent reduction in her ability to use her arm. The jury saw photographs of the bruising all over her body and heard a doctor's testimony that the strangulation and significant trauma she had suffered could have been life-threatening. This evidence proved she sustained bodily injury that created a substantial risk of death or that caused serious permanent disfigurement or protracted loss or impairment of the function of a bodily member or organ. *See* TEX. PENAL CODE ANN.§ 1.07(a)(46) (defining [s]erious bodily injury); *Brown v. State*, 605 S.W.2d 572, 575 (Tex. Crim. App. 1980) (concluding that a broken nose and associated disfigurement that would have occurred if bone had not been set were serious bodily injury), *abrogated on other grounds by Hedicke v. State*, 779 S.W.2d 837 (Tex. Crim. App. 1989).

As to the identity of the assailant, the jury heard several forms of evidence that linked Rodriguez to the assault:

- a witness's description of the argument on the night of the assault wherein Rodriguez again accused her of cheating, which was the apparent catalyst for the crime;

–14–

- testimony by Catherine's friend, who noticed her heavy makeup and a distinct change in her behavior at work between the night of the second extraneous assault on February 16th and the charged assault on the 23rd;

- Catherine's detailed, coherent account of how the beatings unfolded and Rodriguez's motive (paranoid jealousy and control);

- testimony from a physician that it was "quite common" in his experience for victims of domestic violence to change their stories, as Catherine had done, to protect their partners;

- the photographs and physical evidence—including the blood splattered items from their home, the broken golf club that Rodriguez reportedly snapped on Catherine's elbow, and the cracked shell of Catherine's turtle—that corroborated Catherine's trial testimony;

- accounts by Catherine's friend and sister of her friend about Catherine's withdrawal from work life and cessation of any contact in the week following the assault, which the jury could have reasonably attributed to her continuing proximity to the true assailant;

- Rodriguez's admissions that he did not seek aid for his pregnant partner despite her significant injuries and that he hid her from police upon their arrival, which the jury was free to interpret as signs of his guilt; and

- other unexplained inconsistencies in Rodriguez's alternative version of events.

In light of these considerations, we conclude that any error by the trial court in allowing the prosecution to generalize Rodriguez among the "people who commit domestic violence" was harmless. Overruling Rodriguez's objection to the statements did not affect his substantial rights by denying him a fair trial. We overrule Rodriguez's first issue.

## III. ADMISSION OF THE EXTRANEOUS BAD ACTS WAS NOT ERROR

In his second issue, Rodriguez asserts that the trial court erred when it overruled his objections to testimony concerning three extraneous bad acts on the grounds that they had no relevance apart from character conformity and that their probative value was substantially outweighed by the risk of prejudice.

One of the extraneous acts took place in May 2019. Rodriguez accused Catherine of cheating on him and slapped her in the face. Catherine grew angry and prepared to leave the house, but Rodriguez apologized, and she stayed. Looking back on the incident, Catherine testified that Rodriguez was trying to control the situation by manipulating her with an apology.

Another extraneous act took place in June 2019. Rodriguez had agreed to pick her up after work, but when she went out to meet him, he was not there. She called him repeatedly, but he would not answer his phone. Eventually, she saw him in her car, which was parked across the street in a convenience store parking lot. Rodriguez had been in a wreck that broke her car's front axle. He had been drinking.

The third and final extraneous act took place in February 2020, in the week before the charged assault. Rodriguez had begun accusing Catherine of cheating on him more frequently. On Sunday, February 16, Rodriguez again accused her and punched her, leaving her with a black eye. She called in sick to work the next few days and when she returned to work that Friday, she wore heavy makeup to conceal her bruises. She told her manager that she had been hit in the eye with a football.

The trial court overruled Rodriguez's objections and admitted Catherine's testimony concerning these bad acts.

## A. Standard of Review and Applicable Law

### 1. Rule 404(b) and Article 38.371

Because trial courts are in the best position to decide questions of admissibility, we review the admission of extraneous offenses under an abuse of discretion standard. *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001); *see also De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). An abuse of discretion occurs when the ruling was so clearly wrong as to lie outside that zone within which reasonable persons might disagree. *Henley v. State*, 493 S.W.3d 77, 83 (Tex. Crim. App. 2016) (citing *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008)).

Rule 404(b) precludes the admission of evidence of a crime, wrong, or other act to prove a person's character in order to show that he acted in conformity with that character on a particular occasion. TEX. R. EVID. 404(b). However, the evidence may be admitted for other purposes, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. *Id.* The other purposes listed in Rule 404(b) "are neither mutually exclusive nor collectively exhaustive." *De La Paz*, 279 S.W.3d at 343. Rule 404(b) is a rule of inclusion rather than exclusion—it excludes only evidence that is offered solely for

proving bad character and conduct in conformity with that bad character. *Dabney v. State*, 492 S.W.3d 309, 317 (Tex. Crim. App. 2016).

Article 38.371 "provides another non-character-conforming purpose for admitting extraneous-offense evidence." *Andrews v. State*, Nos. 05-21-00388-CR, 05-21-00389-CR, 2023 WL 3089812, at \*2 (Tex. App.—Dallas Apr. 26, 2023, no pet.) (mem. op., not designated for publication) (quoting *James v. State*, 623 S.W.3d 533, 545 (Tex. App.—Fort Worth 2021, no pet.)). This article expressly allows, in dating and family violence cases, "evidence of all relevant facts and circumstances that would assist the trier of fact in determining whether the actor committed the offense . . . including testimony or evidence regarding the nature of the relationship between the actor and the alleged victim." TEX. CODE CRIM. PROC. ANN. art. 38.371(b).

Extraneous-offense evidence held admissible under Article 38.371 has included proof that (1) explains why a complainant of domestic violence is unwilling to cooperate with prosecution, (2) confirms the victim's initial—and later recanted—statements to police; or (3) contextualizes the nature of the relationship between the complainant and the assailant. *Cabello v. State*, No. 13-19-00341-CR, 2022 WL 3451368, at \*20 (Tex. App.—Corpus Christi–Edinburg Aug. 18, 2022, no pet.) (mem. op., not designated for publication); *Fernandez v. State*, 597 S.W.3d 546, 566 (Tex. App.—El Paso 2020, pet. ref'd); *accord Andrews*, 2023 WL 3089812, at \*2;

*Gadsden v. State*, No. 02-21-00195-CR, 2023 WL 2607559, at \*5 (Tex. App.—Fort Worth Mar. 23, 2023, no pet.) (mem. op., not designated for publication).

### 2. Rule 403

Regardless of admissibility under Rule 404(b) or Article 38.371, relevant evidence may be excluded under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. *See* TEX. R. EVID. 403. When a Rule 403 objection is made, the trial court must engage in a balancing process that considers: (1) how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable; (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence, during which the jury will be distracted from consideration of the indicted offense; and (4) the proponent's need for the evidence. *Perkins v. State*, 664 S.W.3d 209, 216 (Tex. Crim. App. 2022) (citing *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999)). The balance is always slanted toward admission of relevant evidence because Rule 403 carries a presumption that relevant evidence will generally be more probative than prejudicial. *De La Paz*, 279 S.W.3d at 343 & n.17.

"If judicial restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal." *Montgomery*, 810 S.W.2d at 379 (quoting *United States v. Long*, 574 F.2d 761, 767 (3d Cir. 1978)). We reverse a

trial court's determination under Rule 403 "rarely and only after a clear abuse of discretion." *Perkins*, 664 S.W.3d at 217.

### B. There Was No Abuse of Discretion in Admitting the Extraneous Acts

The extraneous acts were admissible under Article 38.371. Each of the challenged acts would assist the jury in determining whether Rodriguez committed the assault, whether by illustrating Rodriguez's motives (jealous paranoia and control), by shedding light on the relationship's dynamics, by establishing identity, or by allowing the true version of events to shine through when Catherine changed her story.

As for the ruling on the Rule 403 objection, we find no error. Even though the State had other evidence in favor of its case, the extraneous offenses nonetheless had significant probative value in the absence of other eyewitnesses to illuminate the nature of Catherine's relationship with Rodriguez. The two physical attacks by Rodriguez sparked by his accusations of cheating further demonstrate why Catherine initially lied about the assault and did not contact the police and also provide additional evidence of Rodriguez's motives and identity.

In addition, the evidence had minimal potential for unfair prejudice and required little time to present. The severity of the extraneous bad acts was dwarfed in comparison to the magnitude of the charged offense. *See Dies v. State*, 649 S.W.3d 273, 286 (Tex. App.—Dallas 2022, pet. ref'd) (stating that the potential for unfair prejudice is reduced, relatively, where the extraneous offense is "no more

serious than" the charged offense).  Moreover, any tendency to draw impermissible inferences of character conformity "can be minimized through a limiting instruction," and the trial court gave such an instruction.  *See Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996).  The extraneous acts were developed over the course of twelve record pages, not all of which were devoted to the acts.  This represented a small fraction of the roughly 400-page record for the State's case-in-chief.  *See id.* (determining that the length of the extraneous-offense testimony was not "excessive" where it constituted less than one-fifth of the State's case-in-chief).

On balance, we conclude that the trial court could reasonably decide that the probative value of the extraneous acts evidence was not substantially outweighed by the danger of unfair prejudice.  Because the trial court did not abuse its discretion in admitting this evidence, we overrule Rodriguez's second issue.

## IV.  EXCLUSION OF THE ALTERNATIVE PERPETRATOR EVIDENCE WAS NOT ERROR

In his third issue, Rodriguez argues that the trial court erred when it excluded his proposed evidence that Catherine's brother committed the offense.  First, Rodriguez asserts that the trial court erred by not permitting him to question Catherine about being the victim of sexual abuse by her brother, thus impacting his defense theory and precluding him from fully cross-examining Catherine in violation of the Sixth Amendment.  Second, Rodriguez argues that the trial court erred by not allowing him to offer his own testimony that Catherine's brother might have been the true assailant.  He maintains that these two errors excluded evidence that went

to the heart of his defense, thereby denying his constitutional right to present a complete defense. The trial judge heard the proffered testimony during two hearings held outside the presence of the jury. The State argued that the testimony was not relevant and much more prejudicial than probative. With respect to Rodriguez's testimony about Catherine's brother being a possible perpetrator, the State further argued that the testimony was irrelevant, mere speculation, and lacked a nexus to the crime at hand. The trial judge determined that both proffers of testimony were inadmissible and sustained the State's objections.

We review the exclusion of alternative perpetrator evidence implicating the defendant's right to present a complete defense for an abuse of discretion. *See Wiley v. State*, 74 S.W.3d 399, 408 (Tex. Crim. App. 2002). The Texas Court of Criminal Appeals has noted that "[e]rroneous evidentiary rulings rarely rise to the level of denying the fundamental constitutional rights to present a meaningful defense." *Id.* at 405 (quoting *Potier v. State*, 68 S.W.3d 657, 663 (Tex. Crim. App. 2002)). However, rulings excluding evidence might rise to the level of a constitutional violation under two scenarios: (1) a state evidentiary rule that categorically and arbitrarily prohibits the defendant from offering otherwise relevant, reliable evidence that is vital to his defense; and (2) a trial court's clearly erroneous ruling excluding otherwise relevant, reliable evidence that "forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Id.* In the second category, which is at issue in the present case, the rule

itself is appropriate, but the trial court erroneously applies the rule to exclude admissible evidence to such an extent that it effectively prevents the defendant from presenting his defensive theory. *Id.* In other words, the erroneous ruling goes to the heart of the defense. *Id.*

The admission of alternative perpetrator evidence is subject to the Rule 403 balancing test. *See id.* at 405–06. As discussed earlier, the trial court may exclude relevant evidence under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. TEX. R. EVID. 403.

The Texas Court of Criminal Appeals has emphasized that courts must be sensitive to the special problems presented by "alternative perpetrator" evidence when weighing probative value against the danger of unfair prejudice and other counterfactors under Rule 403. *Wiley*, 74 S.W.3d at 406. Although a defendant obviously has a right to attempt to establish his innocence by showing that someone else committed the crime, he still must show that his proffered evidence regarding the alleged alternative perpetrator is sufficient, on its own or in combination with other evidence in the record, to show a nexus between the crime charged and the alleged alternative perpetrator. *Id.* It is not sufficient for a defendant merely to offer up unsupported speculation that another person may have committed the crime. *Id.* at 407 (citing *United States v. McVeigh*, 153 F.3d 1166, 1191 (10thCir. 1998)).

Rodriguez has not met this burden. The evidence in question was testimony concerning Catherine's relationship with her brother. During Rodriguez's proffer of Catherine's testimony outside the presence of the jury, Catherine agreed that she had a sexual experience with her brother as a child, though she denied that she felt controlled by him or that she had told Rodriguez she feared her brother or couldn't do anything without her brother's permission. Rodriguez argues that Catherine's testimony about her relationship with her brother relates to her credibility and whether she is covering up for her brother.

In his second offer of proof, Rodriguez testified that Catherine and her brother had an improper relationship up until the time Rodriguez and Catherine began dating and that her brother was a controlling, flirtatious, and jealous presence in her life who had often driven away her boyfriends in the past. Rodriguez also proposed to tell the jury about two incidents involving Catherine's brother: one in which Catherine's brother had offered Rodriguez money to "make" someone who was pressing charges against her brother "stop pressing this issue," and another in which Catherine had a fight with her brother wherein he demanded that she end her relationship with Rodriguez shortly before she was assaulted.

The proposed testimony does not supply sufficient relevant facts as to whether Catherine's brother committed the assault; it was pure speculation. When asked "So is what you're saying is you think Billy might be the person that beat [Catherine]?" Rodriguez answered, "I can't answer that, because I don't know. I don't know if it

–24–

was him physically or someone else. So I can't give you a yes or no." And, as a follow up to "You just think it's a possibility?" he answered, "It's a big possibility." Rodriguez has not shown that his proposed evidence regarding the alleged alternative perpetrator is sufficient, on its own or in combination with other evidence in the record, to show a nexus between the crime charged and the alleged alternative perpetrator. *See id.* at 405–08. Rodriguez's allegations about Catherine's relationship with her brother are general and speculative, and do not provide a nexus with the events of February 23. Rodriguez's proposed testimony did not explain why or how Catherine's brother might have appeared in the parking lot of the closed Walmart that, according to Rodriguez's testimony, his pregnant significant other visited at 2 a.m. on the night of the assault. Nor did this testimony explain away any of the evidence, detailed *supra*, that overwhelmingly pointed to Rodriguez as the true perpetrator.

We conclude that the proffered testimony does not survive the balancing test under Rule 403 due to the highly speculative nature of the proffered evidence that Catherine's brother may have been the assailant and the prejudicial and potentially distracting evidence regarding her relationship with her brother. *See* TEX. R. EVID. 403. Rodriguez did not demonstrate that the trial judge's ruling was "clearly erroneous" in violation of his constitutional rights. *See Wiley*, 74 S.W.3d at 408. We conclude that the trial judge did not abuse his discretion in excluding the testimony.

We overrule Rodriguez's third and final issue.

## V.   CONCLUSION

We affirm the judgment of conviction.

220476f.p05
Publish
TEX. R. APP. P. 47

/Emily Miskel/
EMILY MISKEL
JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

APOLONIO RODRIGUEZ III,
Appellant

No. 05-22-00476-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 199th Judicial
District Court, Collin County, Texas
Trial Court Cause No. 199-80716-
2022.
Opinion delivered by Justice Miskel.
Justices Partida-Kipness and Reichek
participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 24th day of October, 2023.